2004 ND 78

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Steven PARIZEK, Defendant and Appellant.**

**Nos. 20030085–20030088.**

Supreme Court of North Dakota.

April 13, 2004.

Lonnie Olson, State's Attorney, Devils Lake, N.D., for plaintiff and appellee.

Kerry Shannon Rosenquist, Grand Forks, N.D., for defendant and appellant.

NEUMANN, Justice.

[¶ 1] Steven Parizek appealed from criminal judgments entered on jury verdicts finding him guilty of manufacturing methamphetamine, possessing methamphetamine, possessing drug paraphernalia, and possessing marijuana. We conclude the district court did not err in denying Parizek's motion to suppress evidence, and we affirm.

I

[¶ 2] Shortly after midnight on the morning of September 4, 2002, Officers Virginia Gjestvang and Theodore Rainesalo were dispatched to a residence at Southview East lot number 10 in Devils Lake to respond to a call that a person was knocking on the inhabitant's door. The officers pulled into the Southview East parking lot with their lights off and approached the residence. The officers observed a blue van parked in the driveway with a man sitting in it, and a man and woman at the door of the residence speaking to one of the inhabitants. Officer Rainesalo approached the two people at the door, Parizek and Shawn Lumley, and Officer Gjestvang remained back near the van where Alonza Wilson, Jr., was seated. When Officer Rainesalo arrived at the door, an inhabitant told him he wanted Parizek and Lumley "out of here." Rainesalo escorted them to the front of the van, told them to stay there, and walked back to talk to the inhabitant. Lumley followed him back to the door. The inhabitant told Rainesalo that "these people had been to his door three times during this night and he was getting tired of being woke up and he wanted them gone. He didn't care what

they wanted. Something about they wanted an address, or a phone number to somebody in town...."

[¶ 3] During this time, Officer Gjestvang began talking with Parizek near the van and noticed he was "acting odd." Officer Gjestvang testified:

A.... I was talking to Mr. Parizek. He was very jumpy, kind of bouncing all over the place, just acting odd. He had reached towards his pockets and I—

Q. Did that cause you some concern?

A. Yeah. You know, it's a little after midnight. You know, it's somewhat hard to see. You know, I want to know if somebody has got weapons on them, or you know especially as he was acting suspicious, jumping around and stuff like that.

Q. Okay. What did you do next?

A. I asked him to keep his hands out of his pockets. I asked him if he had any weapons on him. He said no.

I did just an external pat down of his front pockets and rear pockets of his pants. I felt what appeared to be like a cylinder type object in his, I believe it was his right front pocket of his pants. I asked him what that was. I believe he said it was a lighter and he—

Q. Did it feel like a lighter?

A. It didn't, I mean it was kind of hard to tell, because I was just doing an external pat down. But he began reaching for his pockets again and I told him to keep his hands out of his pockets.

And at that point, I decided to find out what that object was. So I then pulled it out of his pocket and it was a cylinder, a little silver cylinder.

Q. Okay. What happened then?

A. I asked Mr. Parizek, I said, "What is this?" And he said, "It's a lighter." I said, "It doesn't look like a lighter."

You know, it didn't even closely resemble one.

It appeared that it opened somehow. We had a little bit of difficulty actually getting the object open. But he snatched it out of my hands before I even—

Q. Before you had a chance to really look at it?

A. Right. He swiped it out of my hands and started to step back from me. And then he showed me a blue rock. He was—I don't know if he was trying to distract me with this blue rock, or what he was doing, but he was kind of waving it in my face saying, "Look at my rock."

And I said, "Well, I'm not real interested in your rock. I want that back."

Q. And then?

A. And at that point you know he is still stepping back from me, and he's still got the object. I told him again, "I want that object back."

He is refusing. He is not—you know, he is still showing me this rock. So we ended up having a sort of brief scuffle. Nothing major, but just a little bit of wrestling right by a car there that was, another car that parked in front of the van.

Q. Okay.

A. And during that scuffle, the cylinder was thrown into the yard next to where the car was parked.

[¶ 4] Officer Rainesalo heard Officer Gjestvang yelling for assistance, and helped her place handcuffs on Parizek. Officer Gjestvang found the cylinder in a patch of grass in the yard. After Officer Rainesalo placed Parizek in his vehicle, he talked to Lumley, who began "acting nervous, jumpy, not following commands." Officer Rainesalo asked Lumley to take her hands out of her pockets and Lumley walked away from him to the back of the

van. Officer Gjestvang patted down Lumley against the back of the van and handcuffed her. Officer Gjestvang testified:

A. While I had her towards the rear of the van, there was a little bit of light and I just caught a glimpse of what appeared to be a funnel.

I sat Ms. Lumley down on the ground and I went back with my flashlight and just looked in the rear of the van. It had a—it's one of those older vans with a really large window in the back. I just looked in, from outside you could see a funnel, a container of some kind of chemical, a burner, and there was another item there that was easily visible. I believe it was a coffee pot.

All these items are, were suspicious in nature for the manufacture of methamphetamine.

[¶ 5] Wilson was removed from the van and he and Lumley were placed in the officers' vehicles. The officers called a special agent and a detective to assist. After the special agent and detective arrived, Officer Gjestvang, with assistance from the detective, opened the cylinder and found a green leafy substance that appeared to be marijuana and a small tin foil containing what turned out to be methamphetamine. Parizek, who owned the van, consented to a search of the van, and the search revealed the articles in the van were used for manufacturing methamphetamine. Parizek, Lumley and Wilson were placed under arrest and charges were filed against them.

[¶ 6] A preliminary hearing for Lumley and Wilson was held on November 26, 2002. Parizek was not present, but his attorney was there to question the officers who testified. Lumley, Parizek and Wilson moved to suppress the evidence. Parizek's preliminary hearing was held on February 3, 2003. Parizek and law enforcement officers testified. The district court based its decision on the motion to suppress on the record of both hearings, as well as a transcript of an audio recording of the conversation between Parizek and the officers on the morning of September 4, 2002. The transcript of the audio recording stated Officer Gjestvang on two occasions during the encounter asked Parizek to keep his hands "in" his pockets. The court denied the suppression motion, concluding the investigative stop of Parizek was justified, the frisk was reasonable, the pocket search was justified, and that Parizek's consent to the search of the van was voluntarily given. A jury returned verdicts finding Parizek guilty of all charges. Parizek appealed, challenging on Fourth Amendment grounds the district court's denial of his suppression motion. Parizek does not challenge the propriety of the district court's use of the records from both preliminary hearings to decide the suppression motion.

II

[¶ 7] When reviewing a district court's ruling on a motion to suppress, we defer to the district court's findings of fact and resolve conflicts in the evidence in favor of affirmance. *City of Fargo v. Wonder*, 2002 ND 142, ¶ 8, 651 N.W.2d 665. We will affirm the district court's factual findings unless we conclude there is insufficient competent evidence to support the decision or the decision is contrary to the manifest weight of the evidence. *City of Jamestown v. Jerome*, 2002 ND 34, ¶ 6, 639 N.W.2d 478. This standard of review accords great deference to the district court's findings of fact, recognizing the district court is in a superior position to assess credibility of the witnesses and to weigh the evidence. *City of Jamestown v. Dardis*, 2000 ND 186, ¶ 7, 618 N.W.2d 495. Questions of law, such as the ultimate conclusion of whether the facts support a rea-

sonable and articulable suspicion, are fully reviewable on appeal. *State v. Fields*, 2003 ND 81, ¶ 6, 662 N.W.2d 242.

### A

[¶ 8] Parizek argues the officers in this case had no right to stop or "seize" him.

[¶ 9] To stop a person for investigative purposes, an officer must have an articulable and reasonable suspicion that a law has been or is being violated. *City of Devils Lake v. Lawrence*, 2002 ND 31, ¶ 8, 639 N.W.2d 466. In determining whether an investigative stop is valid, we use an objective standard and look to the totality of the circumstances. *State v. Loh*, 2000 ND 188, ¶ 5, 618 N.W.2d 477. The question is whether a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in unlawful activity. *Fields*, 2003 ND 81, ¶ 13, 662 N.W.2d 242. The itemized reasons for a stop listed in N.D.C.C. § 29-29-21 are not exclusive of the instances where a stop on reasonable suspicion grounds is appropriate. *State v. Boline*, 1998 ND 67, ¶ 29, 575 N.W.2d 906.

[¶ 10] This Court has recognized that police officers may "freeze" a situation and conduct a limited investigative stop of persons present at the scene of a recently committed crime without violating the Fourth Amendment. *See Lawrence*, 2002 ND 31, ¶¶ 10–17, 639 N.W.2d 466; *City of Fargo v. Ovind*, 1998 ND 69, ¶¶ 12–13, 575 N.W.2d 901. Even in circumstances where no one person can be singled out as the probable offender, police officers must be allowed to take some action intermediate to that of arrest and nonseizure activity where corroboration of a tip through observation of illegality is not practical. *Lawrence*, at ¶ 11; *Ovind*, at ¶ 12. Consequently, in *Ovind*, at ¶ 17, we upheld an investigative stop of a vehicle backing out of a parking spot in a restaurant parking lot by an officer responding to an early morning dispatch reporting a fight at the restaurant. In *Lawrence*, at ¶ 12, we upheld an investigative stop of a vehicle leaving the parking lot of a bar by an officer responding to a dispatch that a fight was going to begin at the bar. We rejected the argument that the officers had no articulable suspicion that a crime had been committed because the officers knew there had been no physical altercation at the bar, but only a verbal altercation. *Id.* We said the verbal altercation could have constituted the crime of disorderly conduct, and concluded an "officer's reasonable and articulable suspicion that an individual has committed the offense of disorderly conduct is sufficient to justify a temporary detention of that individual for investigative purposes." *Id.* at ¶ 14.

[¶ 11] The district court found the brief detention in this case was justified, reasoning:

> Here, the officers were investigating an unwanted guests complaint by a citizen. The officers had briefly detained Parizek and Lumley in the driveway of the home until Officer Rainaselo [sic] could determine from the owner what was 'going on' including any criminal activity. It is reasonable to conclude that the officers thought these individuals may have been involved in some type of criminal activity when they stopped them in the driveway of # 10 Southview Estates.

[¶ 12] Parizek argues the court's reasoning is flawed because the officers could not have had any articulable suspicion of criminal activity. Parizek argues the only information the officers received from dispatch was that someone was knocking on the complainant's door, and although an inhabitant of the residence informed Offi-

cer Rainesalo that Parizek and Lumley had been there three times that night, there was no evidence that the owner had asked them to leave. A person is guilty of criminal trespass under N.D.C.C. § 12.1–22–03(4) "if that person remains upon the property of another after being requested to leave the property by a duly authorized person." The officers were not required to have probable cause to arrest for violation of a law, but only reasonable and articulable suspicion that a law had been violated. *E.g., State v. Corum*, 2003 ND 89, ¶ 10, 663 N.W.2d 151. Although the dispatch may have been somewhat ambiguous, a call to the police is an unusual response to a knock on the door. The " 'lateness of the hour' " is another factor that may raise the level of suspicion to justify an investigative stop. *Fields*, 2003 ND 81, ¶ 20, 662 N.W.2d 242 (quoting *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993)). Under the totality of the circumstances, we conclude the officers had a reasonable and articulable suspicion that Parizek was engaged in unlawful activity, and were justified in temporarily detaining him to freeze the situation for further investigation.

B

▆ [¶ 13] Parizek argues there was no justification for Officer Gjestvang to conduct a pat down search of him.

▆ [¶ 14] A law enforcement officer may conduct a frisk or a pat down search of a person only when the officer possesses an articulable suspicion the individual is armed and dangerous. *State v. Tognotti*, 2003 ND 99, ¶ 16, 663 N.W.2d 642. In *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

"The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S.Ct. 1868.

▆ [¶ 15] When Officer Gjestvang began talking with Parizek, "[h]e was very jumpy, kind of bouncing all over the place, just acting odd. He had reached towards his pockets . . ." Officer Gjestvang testified she asked him to "keep his hands out of his pockets." Reaching into one's pockets after being told not to do so gives an officer an articulable suspicion that the subject might be armed and dangerous. *See State v. Tollefson*, 2003 ND 73, ¶ 11, 660 N.W.2d 575. Parizek argues placing his hands in his pockets cannot be used to justify the pat down search because the transcript of the audio recording establishes Officer Gjestvang told him to put his hands in his pockets. The district court found that Parizek "had been told earlier to keep his hands still and not move them around," and this finding is not contrary to the manifest weight of the evidence. The transcript of the audio recording reveals Parizek was not following Officer Gjestvang's instructions, whether she told him to keep his hands in or out of his pockets.

Indeed, Parizek testified at his preliminary hearing that "I didn't have my hands in my pocket or nothing like that," which is contrary to Officer Gjestvang's instructions revealed in the transcript of the audio tape. We agree with the district court that Parizek's "jumpy behavior and his reaching toward his pockets in the dark of night justified this officer to conduct a pat-down search."

## C

[¶ 16] Parizek argues Officer Gjestvang was not justified in searching his pocket.

[¶ 17] A valid pat down search consists solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. *Tollefson*, 2003 ND 73, ¶ 13, 660 N.W.2d 575. A pat down is not simply a routine preliminary to a more extensive search. *State v. Zearley*, 444 N.W.2d 353, 359 (N.D.1989). When an outside clothing pat down search reveals the presence of an object of a size and density that reasonably suggests the object might be a weapon, the searching officer is entitled to continue the search to the inner garments where the object is located in order to determine whether the object is in fact a weapon. *State v. Heitzmann*, 2001 ND 136, ¶ 13, 632 N.W.2d 1. Because weapon verification is essential if safety is to be preserved and a potentially volatile situation neutralized, certainty that an object is a weapon is not required before an officer may continue a pat down search to the inner clothing site where the object is located. *Tollefson*, at ¶ 14; *State v. Zearley*, 468 N.W.2d 391, 392 (N.D. 1991). Moreover, a more intrusive *Terry* search may be constitutionally permissible if the officer is proportionately responding to the actions of a subject. *Heitzmann*, at ¶ 16. However, if an officer continues to explore a detainee's pocket after concluding it contains no weapon, the valid scope of a *Terry* search has been exceeded and any contraband discovered in the pocket must be suppressed. *Id.* at ¶ 13.

[¶ 18] During the pat down search, Officer Gjestvang "felt what appeared to be like a cylinder type object" in Parizek's pocket. Parizek was not complying with Officer Gjestvang's instructions and his hand movements were unpredictable. Parizek was "jumpy, kind of bouncing all over the place, just acting odd." Parizek told Officer Gjestvang the object was a lighter, but she did not believe it was a lighter. When asked if there could have been a weapon inside the cylinder, Officer Gjestvang testified, "I guess nothing, you know comes to mind, just sitting here. Initially feeling it from the outside, I was unable to tell exactly what it ... was." When asked if she knew the cylinder was not a weapon, she testified, "[w]ell, I don't know that for sure. But it didn't appear at that point that it was."

[¶ 19] Although Officer Gjestvang did not believe the cylinder was a weapon, she was not certain the object was not a weapon. Given Parizek's erratic behavior, we agree with the district court that Officer Gjestvang's "actions were a proportionate response to the defendant's actions and her safety concerns," and "[s]he acted reasonably to protect herself by taking possession of the object." We conclude Officer Gjestvang was justified in conducting the pocket search.

## D

[¶ 20] Parizek argues the opening and search of the cylinder after it had been removed from his pocket was illegal.

[¶ 21] Officer Gjestvang testified she "could tell" the cylinder was not a weapon "[o]nce [she] took [it] out" of Pari-

zek's pocket. The district court found that "[o]nce the object was removed from the pocket, Officer Gjestvang agreed the safety issues diminished and curiosity replaced safety." Generally, where an object recovered from a suspect during a pat down search is a closed container, the officer may not open the container to examine its contents unless the officer can point to specific and articulable facts supporting a reasonable suspicion that the closed container poses a danger to the officer or others nearby. *See, e.g., People v. Ratcliff,* 778 P.2d 1371, 1380 (Colo.1989); *State v. Harrison,* 957 S.W.2d 774, 777–78 (Mo.Ct. App.1997); *State v. Wiggins,* 184 Or.App. 333, 56 P.3d 436, 440 (2002); *Phillips v. Commonwealth,* 17 Va.App. 27, 434 S.E.2d 918, 920–21 (1993); *see also* 4 Wayne R. LaFave, *Search and Seizure* § 9.5(d) (3d ed.1996). However, even if opening and searching the cylinder was illegal, it does not follow that Parizek should have prevailed on his motion to suppress.

[¶ 22] Evidence obtained by unlawful police conduct is admissible if the prosecution proves by a preponderance of the evidence that the evidence would have inevitably been discovered by lawful means. *State v. Waltz,* 2003 ND 197, ¶ 17, 672 N.W.2d 457. Before the cylinder was opened and searched, Lumley walked away from Officer Rainesalo to the back of the van and Officer Gjestvang, while patting down Lumley, "caught a glimpse of what appeared to be a funnel" through the van's large back window. Officer Gjestvang, with the aid of a flashlight, looked through the van window and observed items used for manufacturing methamphetamine. Officer Gjestvang's use of a flashlight to see inside of the van does not render her observations illegal under the plain view doctrine. *See State v. Klodt,* 298 N.W.2d 783, 787 (N.D.1980); *see also Mollica v. Volker,* 229 F.3d 366, 369 (2d Cir.2000); *United States v. Hatten,* 68 F.3d 257, 261 (8th Cir.1995). A special agent and a detective were called to assist. Upon arriving, the special agent told Officer Gjestvang "basically from the items that he could see from the outside of the vehicle that at that point we were going to place all three under arrest." Officer Gjestvang, with assistance, then managed to open and search the cylinder.

[¶ 23] It was not the knowledge the officers gained by opening the cylinder that led to the discovery of the incriminating items in the van, but it was Lumley's failure to stand still that led the officers to the van and to the subsequent plain view observation of the incriminating items. Parizek consented to a search of his van, and Parizek does not challenge on appeal the district court's finding that his consent was voluntarily given. The discovery of the items in the van gave the officers probable cause to arrest Parizek, Lumley and Wilson. If the fruits of a challenged search are not necessary to support probable cause to arrest, it is not important that the challenged search shortly preceded the formal arrest. *Rawlings v. Kentucky,* 448 U.S. 98, 111 & n. 6, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). The marijuana and methamphetamine discovered in the cylinder were not necessary to establish probable cause to arrest Parizek, and it would have inevitably been discovered in the valid search incident to Parizek's arrest. *See Waltz,* at ¶ 17; *State v. Olson,* 1998 ND 41, ¶¶ 16–17, 575 N.W.2d 649. Therefore, we conclude the district court did not err in denying Parizek's motion to suppress.

### III

[¶ 24] Parizek asserts the evidence should have been suppressed under N.D. Const. art. I, § 8, but has not marshaled a separate argument under the state constitution. This is insufficient to raise the

state constitutional argument for our consideration. *See State v. Holzer*, 2003 ND 19, ¶ 15, 656 N.W.2d 686; *State v. Stewart*, 1999 ND 154, ¶ 25 n. 8, 598 N.W.2d 773; *State v. Garrett*, 1998 ND 173, ¶ 9 n. 1, 584 N.W.2d 502.

## IV

[¶ 25]   The criminal judgments are affirmed.

[¶ 26]   GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER and DALE V. SANDSTROM, JJ., concur.